# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

<table>
<tr><td>LASHAWN M. WESTBROOKS</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Civil Case No. SAG-18-1777</td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>BALTIMORE COUNTY, MARYLAND</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Defendant.</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Lashawn M. Westbrooks ("Ms. Westbrooks") filed this case against her former employer, Baltimore County, Maryland ("Defendant"), alleging interference with her rights under the Family and Medical Leave Act of 1993 ("FMLA") (Count One); retaliation for exercising her FMLA rights (Count Two); intentional infliction of emotional distress (Count Three); and failure to make reasonable accommodations for her disability (Counts Four, Five, Six, and Seven, under state and federal law). ECF 18. On May 3, 2019, Defendant filed a Motion for Summary Judgment, ECF 25, along with a memorandum of law, ECF 25-1 (collectively, the "Motion"). Ms. Westbrooks opposed the motion ("Opposition"), ECF 28, and Defendant replied, ECF 29 ("Reply"). I find that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, I will grant in part and deny in part the Motion.

## I. FACTUAL BACKGROUND

The facts below are taken in the light most favorable to Ms. Westbrooks, the non-moving party. In January of 2006, Ms. Westbrooks was hired as a Correctional Officer at the Baltimore County Detention Center ("BCDC"). ECF 28-1 ¶ 2. Throughout her tenure at the BCDC, Ms. Westbrooks received satisfactory annual performance evaluations, except for consistent concerns

about her attendance. *See* ECF 25-2 (County Apx. 077-097). Since approximately 2014, Ms. Westbrooks has suffered from anxiety. ECF 28-1 ¶ 3. When her anxiety "flares up," she experiences "crying, sadness, dizziness, shortness of breath, excessive worry, insomnia, and an upset stomach." *Id.* When she experiences these symptoms, she attests that she is also unable to work at the BCDC. *Id.*

On May 13, 2017, Ms. Westbrooks applied for medical leave under the FMLA.[1] *Id.* ¶ 4; ECF 28-3. The application, completed by her Physician Assistant, Natalie Orbach, noted that Ms. Westbrooks has had permanent anxiety and insomnia for the past three years, with episodic flare-ups that made it medically necessary for her to be absent from work approximately two times per month, lasting three to five days per episode. *Id.* On June 1, 2017, the United States Department of Labor approved Ms. Westbrooks's FMLA request with a Designation Notice. ECF 28-1 ¶ 4; ECF 28-5. On June 26, 2017, the Director of Human Resources, George E. Gay, sent a letter to Ms. Westbrooks, approving her intermittent leave request from May 12, 2017 to May 11, 2018, pursuant to the Department of Labor's June 1, 2017 Designation Notice. ECF 28-1 ¶ 4; ECF 28-4. On five separate occasions, from May 13, 2017 through March 13, 2018, Ms. Westbrooks sought treatment for her anxiety from her physician, Manuel Ramos, and Orbach. ECF 28-1 ¶ 38; ECF 28-10.

Starting in May of 2017, Ms. Westbrooks had 480[2] hours of FMLA leave. ECF 25-2 (County Apx. 005, 006). Whenever Ms. Westbrooks took FMLA leave, she was required to call in at least an hour before her shift started, to notify BCDC that she would be using her FMLA

---

[1] Ms. Westbrooks had previously used FMLA leave in 2010, 2015, and 2016, for her own illness and for her children's illnesses. ECF 25-2 (County Apx. 003-004).

[2] While the deposition transcript reads "488 hours," the FMLA allows only 480 hours. *See* 29 U.S.C. § 2612(a)(1).

leave. *Id.* (County Apx. 005, 006, 150-154). If she ever called in absent for a reason other than her FMLA condition, she would use sick leave. *Id.* On May 28, 2017, Ms. Westbrooks was assigned to work in housing unit 3C/D, which was one of the smallest "pod" units. *Id.* (County Apx. 015). Ms. Westbrooks asked Lieutenant Tracey Merrill if she could be switched to another post that had more room for her to walk around. *Id.* According to Ms. Westbrooks, Lieutenant Merrill said, "Oh, no. I'm not moving you. Other people are on light duty as well." *Id.* After roll call, Ms. Westbrooks informed Lieutenant Merrill that she would be taking FMLA leave for the day, to which Lieutenant Merrill responded, "[y]ou can do whatever it is you like," but that Ms. Westbrooks needed medical documentation if she had restrictions at work. *Id.*

On June 1, 2017, Ms. Westbrooks visited Orbach, who wrote,

[Patient] presents for followup [sic] anxiety and insomnia. She missed 2 days last week from work due to anxiety about having to work in a confined area watching inmates. She cannot freely move around the area and she is very restless. She prefers to be in areas that she can freely move around and not be closed in or confined. She had to leave early on one of the days due to anxiety of the assignment she had.

ECF 28-10 at 6. On June 2, 2017, Ms. Westbrooks handed a note from Orbach to her shift supervisor Lieutenant Wilkerson stating, "[d]ue to chronic medical conditions, it is recommended that Lashawn Westbrooks work in areas that allow her to be able to move around freely." ECF 25-2 (County Apx. 015, 161). When Lieutenant Wilkerson asked Ms. Westbrooks about the note, Ms. Westbrooks "felt offended that [Lieutenant Wilkerson] inquired about her medical history," and explained that she did not want to sit in a pod anymore. *Id.* (County Apx. 016, 162).

On June 21, 2017, Ms. Westbrooks met with Captain Greer about the doctor's note she submitted to Lieutenant Wilkerson. *Id.* Captain Greer told Ms. Westbrooks that the note could not be honored because it was a recommendation, and that it must state why she has to be in an area that allows her to walk around. *Id.* (County Apx. 017, 163). Ms. Westbrooks was not assigned

to work in the smaller pod units for the months of June and July. *Id.* (County Apx. 018-019). On July 30, 2017, Ms. Westbrooks brought another note from Orbach to work, which read, "[d]ue to chronic medical conditions, Lashawn Westbrooks should be assigned to areas at work that allow her to be able to move around freely. She will need restrictions for at least 3 months." *Id.* (County Apx. 164).

On August 1, 2017, then-Deputy Director of the BCDC, Gail Watts, emailed Ms. Westbrooks:

> In response to your attached medical restriction documentation, which states *"should be assigned to areas at work that allow her to be able to move around freely"*; you will be assigned to areas throughout the facility to include housing units 2G/H, 3G/H, and 4G/H, which will allow you to move around freely while maintaining observation of inmates.

*Id.* (County Apx. 165). On August 24, 2017, Ms. Westbrooks was assigned to unit 3G/H. *Id.* (County Apx. 021-022, 166). She reported to her assigned unit, but asked Captain Greer to be switched to another housing unit "due to [her] FMLA." *Id.* While on duty, Ms. Westbrooks experienced anxiety in the unit, feeling "dizzy and nauseated and just not feeling well," and was relieved from her duties to go to the hospital. *Id.* Before she left for the hospital, Lieutenant Merrill asked Ms. Westbrooks what type of leave she would be taking, and Ms. Westbrooks said that "she would use FMLA to avoid receiving a code X marking." *Id.* Three days later, on August 27, 2017, Ms. Westbrooks was assigned again to unit 3G/H. *Id.* (County Apx. 022-023, 167-168). After explaining to her shift supervisor that she could not work in 3G/H because of her recent anxiety attack in that unit, Ms. Westbrooks was eventually reassigned to another larger unit. *Id.*

After the August 24, 2017 incident, Ms. Westbrooks met with her union officials to discuss her situation at work. *Id.* (County Apx. 024). One of her union officials referred her to Dr. Aaron

Noonberg for a psychological evaluation.  *Id.* (County Apx. 024, 169-176).  Dr. Noonberg's

September 18, 2017 evaluation of Ms. Westbrooks provides,

> Ms. Westbrooks requires psychological treatment for her anxiety at work, and a
> modified duty assignment in which she is placed on any walking post handling
> inmates, or in direct supervisory positions where she is handling groups of inmates
> in a space in which she is simply able to walk around as much as she needs.  She
> has no problems dealing with inmates and requires no restrictions concerning
> inmates.  She only requires the restriction against being confined in a pod, described
> as a control or observation position blocking her from being able to walk around,
> leading to anxiety that escalated to the panic attack on August 24, 2017. … She
> requires cognitively oriented psychotherapy for the consequences of her intolerance
> of placement in the pods along with desensitization hopefully reversing her
> intolerance, likely to need 12 to 16 visits of psychological treatment.

*Id.* (County Apx. 174).  Ms. Westbrooks testified that she did not seek further treatment from a

therapist.  *Id.* (County Apx. 026).  However, Dr. Noonberg wrote two notes on September 27,

2017, excusing Ms. Westbrooks's absences from September 25th through October 2nd, and noting

that "Patient needs a walking post or direct supervisory assignment without 'POD' placement due

to anxiety disorder."  *Id.* (County Apx. 175-176).  Ms. Westbrooks continued to use her FMLA

leave until it ran out on January 18, 2018, and her supervisors continued to place her outside of the

pods to accommodate her restrictions.  *Id.* (County Apx. 027-028).

On or about December 28, 2017, Ms. Westbrooks alleges that she requested FMLA leave

for her anxiety.  ECF 28-1 ¶ 9.  Ms. Westbrooks attests that she was marked "Code X"[3] for that

day, which she learned during a January 31, 2018 verbal counseling session with Lieutenant

Merrill.  *Id.* ¶ 10.  The verbal counseling report from that session states, "On 12/28/2017 Officer

Westbrooks accumulated her fourth occurrence of sick leave in a twelve month period … The fifth

occurrence of sick time within a 12 month time period will result in [employee] being placed on

---

[3] A "Code X" payroll marking means that the employee is absent without leave ("AWOL").  ECF
25-1 at 17

Excessive Absenteeism Notice (EAN), and progressive discipline as per policy." ECF 28-16. Defendant maintains that Ms. Westbrooks was not marked "Code X" on December 28, 2017, and that the "12/28/17" reference was a clerical error which should have read "01/28/18." ECF 29 at 3 n.2; ECF 29-1 ¶ 4 (Affidavit of Lt. Tracey Merrill). Ms. Westbrooks's "hours detail" report and "activity detail" report, provided by Defendant, do not reflect "sick" or "FMLA" markings, as several other dates do. *See* ECF 25-2 (County Apx. 57, 107-108).

Ms. Westbrooks testified that, during the January 31, 2018 meeting with Lieutenant Merrill, Ms. Westbrooks asked Lieutenant Merrill what to do if she ran out of FMLA leave for her anxiety condition, and that Lieutenant Merrill responded, "[i]t doesn't matter. You will be accommodated for that anyway." ECF 25-2 (County Apx. 009). Defendant's attorney responded, "[w]ell, we'll get to that," but Lieutenant Merrill's statement is not addressed in the remainder of the deposition transcript provided to the Court. *See id.* (County Apx. 001-054).

On February 18, 2018, BCDC Director Watts submitted a "Notice of Excessive Absenteeism Due to Illness" to Human Resources Director George Gay. *Id.* (County Apx. 076). The notice, acknowledged and signed by Ms. Westbrooks, states,

> On 02/16/2018, Officer Westbrooks accumulated her fifth occurrence of sick leave within a 12 month period….In accordance with [the Department's Absence Control Policy 1.3.15[4]], our agency is requesting for Officer Westbrooks to be placed on Exceptional Absenteeism Notice. This notice requires the employee to provide

---

[4] Absence Control Policy 1.3.15 provides:

> On the fifth occasion of sick leave in a 12-month period, a supervisor will meet with the employee and review their leave record and other pertinent facts to determine if the employee is meeting the requirements of the Absence Control Policy. If appropriate, the supervisor will initiate a request to place the employee on Exceptional Absenteeism Notice. This notice requires the employee to provide his/her supervisor with a written physician's excuse from work for any sick leave used during the next 6-month period.

ECF 25-2 (County Apx. 156-159).

his/her supervisor with a written physician's excuse from work for any sick leave used during the next 6-month period.

*Id.* Ms. Westbrooks attested that "[e]ven though [she] requested FMLA leave for [her] anxiety on February 16, 2018, [she] was marked Code X and received the Notice of Excessive Absenteeism." ECF 28-1 ¶ 14.

Although she was out of sick leave and FMLA leave, Ms. Westbrooks called out sick on March 4 and 5, 2018. *See* ECF 25-2 (County Apx. 007) ("Q: And then starting on 3/4, you're marked X, right? A: Yes. Q: That's because you were out of both sick leave and FMLA leave, correct? A: Yes."). Her Absentee Report for March 5 reads, "Confirmed Westbrooks was advised that she doesn't have any sick time and will be marked Code X. Westbrooks advised she knows, will be under Dr.'s care." *Id.* (County Apx. 073). Ms. Westbrooks attempted to return to work on March 8, 2018, but was turned away because she did not have a doctor's note excusing her absences. *Id.* (County Apx. 028).

On March 14, 2018, Ms. Westbrooks returned to work with a doctor's note from Orbach, excusing her absences from March 4, 2018 through March 11, 2018. ECF 28-1 ¶ 16. The note only stated that Ms. Westbrooks could not work from March 4th through March 11th. ECF 25-2 (County Apx. 206). When she handed her doctor's note to Lieutenant Merrill, Lieutenant Merrill stated, "in an aggressive tone, 'Oh no. This is not good enough. You have to get a note for every single day that you are out.'" ECF 28-1 ¶ 17. After a brief exchange, Lieutenant Merrill told Ms. Westbrooks that she would be marked Code X for the days she missed, and that she had to go home. *Id.* ¶ 21. Ms. Westbrooks felt unsafe, and went to speak with Director Watts. *Id.* ¶¶ 22-24. She also contacted one of her union representatives, who said he would send someone over from the union. *Id.* ¶ 25. Lieutenant Merrill then told Ms. Westbrooks to come meet with her and Captain Greer, but Ms. Westbrooks still felt uncomfortable and returned to Director Watts's office.

*Id.* ¶ 26.  Director Watts accepted Ms. Westbrooks's doctor's note, and left for a meeting.  *Id.* ¶ 27.  Before Ms. Westbrooks left the office, Captain Greer approached with Lieutenant Merrill and told Ms. Westbrooks she could return to her post, and she did so.  *Id.* ¶¶ 28, 29.

Several hours later, Ms. Westbrooks was not feeling well, and she was eventually relieved from her post for a lunch break after she wrote a "121 about what took place."[5]  *Id.* ¶¶ 30, 31.  She contacted Dawn Moorefield, who was listed on the after-hours code of conduct form, and told Moorefield she did not feel safe.  *Id.* ¶ 31.  After her lunch break, Ms. Westbrooks returned to her post, but she still felt nauseous, anxious, and fatigued.  *Id.* ¶ 32.  She called one of her supervisors, Sergeant Carter, and told him she was experiencing "a full blown anxiety attack," and asked Sergeant Carter to inform Captain Greer or Lieutenant Merrill because she did not feel comfortable doing so.  *Id.*  Captain Greer ordered Ms. Westbrooks to see him after she left her post, and Ms. Westbrooks asked a fellow employee to accompany her to Captain Greer's office because she "didn't feel safe talking to Capt. Greer."  *Id.* ¶¶ 33, 34.

When Ms. Westbrooks arrived at Captain Greer's office, she handed him the Form 121, and Captain Greer responded, "I don't care what this says, it has nothing to do with me.  I need to talk to you.  You do understand that you do not have any sick time and you would be code X if you leave sick."  *Id.* ¶ 35.  Ms. Westbrooks did not respond and, despite Captain Greer's orders for Ms. Westbrooks to come back, she left work to go directly to the emergency room.  *Id.* ¶¶ 35, 36.  Ms. Westbrooks's treating physician at the emergency room kept her out of work from March 14 through March 16, 2018.  *Id.* ¶ 37; ECF 28-9.  On March 15, 2018, Ms. Westbrooks called the BCDC to tell them she would be absent because of her anxiety, and that she would give them a doctor's note when she returned.  ECF 28-1 ¶ 37.  Ms. Westbrooks was also supposed to have a

_____

[5] A "Form 121" is an internal memo form used at the BCDC.  ECF 25-1 at 18.

disciplinary hearing that same day, based on alleged conduct unrelated to her absences. ECF 25-2 (County Apx. 194). On March 16, 2018, Ms. Westbrooks received an email from the BCDC telling her that she was not allowed to return to work. ECF 28-1 ¶ 37; *see also* ECF 25-2 (County Apx. 195-205). Her Notice of Dismissal and Charges for Removal stated that her charges for removal were violations of the BCDC's standards of conduct, unexcused absences, and sick leave usage. ECF 28-12 at 6. Also on March 16, 2018, Ms. Westbrooks filed Petitions for a Peace Order against Captain Greer and Lieutenant Merrill, because she "was afraid of them." ECF 28-1 ¶ 40; ECF 25-2 (County Apx. 114-130). Her Peace Order petitions were denied. ECF 25-2 (County Apx. 114-130).

On March 22, 2018, Ms. Westbrooks, assisted by her union representative Adam Hendrix, filed a Grievance and Appeal Form, appealing the termination decision. ECF 28-12; ECF 18-11. On April 11, 2018, Hendrix and Ms. Westbrooks attended a meeting about her appeal with Director Watts and Major Alford. ECF 28-11; ECF 25-2 (County Apx. 263). Director Watts denied Ms. Westbrooks's appeal, and upheld the termination. ECF 25-2 (County Apx. 263). This lawsuit followed on May 8, 2018, in the Circuit Court of Maryland for Baltimore County, and Defendant removed the case to this Court on June 14, 2018. ECF 1, 2. Ms. Westbrooks filed an Amended Complaint on December 4, 2018. ECF 18.

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to

support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)). Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.   ANALYSIS

Ms. Westbrooks alleges that Defendant interfered with her medical leave, retaliated against her for taking medical leave, failed to make reasonable accommodations for her disability, and intentionally inflicted emotional distress. ECF 18. In her Opposition, Ms. Westbrooks concedes

that she will be unable to show that Defendant's conduct met the severity required to prove an Intentional Infliction of Emotional Distress claim. ECF 28 at 1. Accordingly, judgment will be granted in favor of Defendant on Count Three.

## A. FMLA claims (Counts One and Two)

Ms. Westbrooks alleges that Defendant interfered with and retaliated against her entitlement to benefits under the FMLA. Under the FMLA, certain employees may take a total of "12 work weeks of leave" during a twelve-month period due to a "serious health condition" that makes the employee "unable to perform the functions of" her job. 29 U.S.C. § 2612(a)(1)(D). In addition, the FMLA "contains *proscriptive* provisions that protect employees from discrimination or retaliation for exercising their substantive rights under the FMLA." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006) (emphasis in original). To that end, the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). "While the FMLA does not specifically forbid discharging an employee in retaliation for his use of FMLA leave, 29 C.F.R. § 825.220(c) states that employers are 'prohibited from discriminating against employees or prospective employees who have used FMLA leave' and that 'employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions.'" *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294-95 (4th Cir. 2009); *see also, e.g.*, *Greene v. YRC, Inc.*, 987 F. Supp. 2d 644, 655 (D. Md 2013).

### 1. Interference

To establish unlawful interference under the FMLA, plaintiff must show: (1) she was entitled to an FMLA benefit; (2) her employer interfered with the provision of that benefit; and (3) that interference caused her harm. *Adams v. Anne Arundel County Public Schools*, 789 F.3d 422, 427 (4th Cir. 2015). In addition to refusing FMLA leave, interference includes "discouraging an

employee from using such leave." 29 C.F.R. § 825.220(b). In terms of harm, a plaintiff must also show that defendant's denial of leave "prejudiced [her] in some way." *Id.* (citing *Anderson v. Discovery Commc'ns, LLC*, 517 F. App'x 190, 197-98 (4th Cir. 2013). Prejudice can be proven by showing that plaintiff lost compensation or benefits, sustained other monetary losses, or suffered some loss in employment status. *Ranade v. BT Americas, Inc.*, 581 F. App'x 182, 185 (4th Cir. 2014).

It is undisputed that Ms. Westbrooks was granted the full twelve weeks of FMLA leave for the period between May 12, 2017 and May 11, 2018. ECF 28-4. Defendant concedes that Ms. Westbrooks was entitled to FMLA leave, but maintains that it never interfered with her use of her FMLA leave. ECF 25-1 at 22. In her Opposition, Ms. Westbrooks premises her interference claim entirely on the December 28, 2017 absence, where Ms. Westbrooks was mistakenly marked Code X by Lieutenant Merrill, followed by a second Code X with a Notice of Excessive Absenteeism on February 16, 2018. ECF 28 at 30. Ms. Westbrooks argues that marking her "Code-X for days she requested FMLA leave for her anxiety constitutes interference with [her] FMLA rights." *Id.*

However, the record reflects that Ms. Westbrooks was not marked Code X for days she requested FMLA leave. Ms. Westbrooks concedes that she used up all of her FMLA leave on January 18, 2018. ECF 28 at 4; *see also* ECF 25-2 (County Apx. 56). The record does not support Ms. Westbrooks's argument that a December 28, 2017 Code X marking interfered with her FMLA leave, a date which would have fallen before she used up all of her FMLA leave. While the verbal counseling report warning Ms. Westbrooks of her fourth occurrence of sick leave usage reflects a clerical error stating that the fourth occurrence was on "12/28/2017," the last sentence of the fact section reads, "Officer Westbrooks used sick leave the following dates: 01/27/2018; 01/18/2018; 04/22/2017; and 02/15/2017." ECF 28-16. These four sick occurrences, including the 01/27/2018

date, but not the 12/28/2017 date, are corroborated by Ms. Westbrooks's "employee activity details" report, reflecting "S" for sick for 01/27/2018, 01/18/2018, 04/22/2017, and 02/15/2017. ECF 25-2 (County Apx. 56, 65, 67). Moreover, the verbal counseling report is dated January 27, 2018, the date that Ms. Westbrooks accrued her fourth sick leave occurrence. ECF 28-16. Consequently, Ms. Westbrooks's fifth sick leave occurrence was on February 16, 2018, as corroborated by her employee hours detail, which triggered the Notice of Excessive Absenteeism under BCDC policy. ECF 25-2 (County Apx. 56); ECF 28-17.

Even taking the allegations in the light most favorable to Ms. Westbrooks, as the Court must, the record establishes that Defendant did not interfere with Ms. Westbrooks's FMLA leave, nor is there any indication that Defendant discouraged Ms. Westbrooks from using her FMLA leave. She concedes that she ran out of FMLA leave on January 18, 2018, and thereafter had to use sick leave. ECF 28 at 4; ECF 25-2 (County Apx. 007) ("Q: …on 1/18, you ran out -- you used your last half hour of FMLA leave, right, so you had to use just regular sick leave the other seven and a half? Do you see that? A: But they marked this sick for the last seven and a half. Q: Because you were out of FMLA leave, correct? A: Yes."). Indeed, Ms. Westbrooks testified that Defendant had granted her the full 480 hours of FMLA leave. ECF 25-2 (County Apx. 028) ("Q: But you knew you were out of FMLA. A: Yes. Q: And we had granted you the full 480 hours, correct? A: Yes."). Once Ms. Westbrooks ran out of her sick leave time, Defendant initiated its proceedings under Absence Control Policy 1.3.15, where a fifth occasion of sick leave in a 12-month period requires a supervisor to meet with the employee to discuss his/her leave record, and, if appropriate, to initiate a request to place the employee on Exceptional Absenteeism Notice. *See* ECF 25-2 (County Apx. 156-159).

In sum, Defendant did not interfere with Ms. Westbrooks's FMLA leave because, as of January 18, 2018, Ms. Westbrooks no longer had any FMLA leave left to use. Thus, because Ms. Westbrooks cannot show that she was denied requested FMLA leave to which she was entitled, her interference claim must fail. *See Adams*, 789 F.3d at 427 (affirming summary judgment in favor of defendant on interference claim when employee "received more than the statutorily guaranteed amount" of FMLA leave and employee "ha[d] not suggested that the [employer] denied him any FMLA leave he requested"); *see also Blackwell v. Publix Super Markets, Inc.*, C.A. No. 6:16-2992-HMH-KFM, 2018 WL 953352, at *8 (D.S.C. Feb. 20, 2018) (granting summary judgment to employer on interference claim because employer had no obligation to restore employee to original position after expiration of FMLA leave and employee's non-compliance with employer's leave policy). Accordingly, summary judgment is appropriate in favor of Defendant on Count One.

### 2. Retaliation

The distinction between an interference claim and a retaliation claim under the FMLA "is not always clear." *Edusei v. Adventist Healthcare, Inc.*, Civ. No. DKC-13-0157, 2017 WL 3345051, at *6 (D. Md. July 7, 2014). "[T]he interference claim merely requires proof that the employer denied the employee [her] entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent" by the employer. *Sherif*, 127 F. Supp. 3d at 477 (quoting *Bosse v. Baltimore Cty*, 692 F. Supp. 2d 574, 588 (D. Md. 2010)). "To survive an employer's motion for summary judgment, a plaintiff must show direct evidence of discrimination, or establish a *prima facie* case that raises an inference of illegal conduct." *Id.* at 489 (citing *Coleman v. Maryland Court of Appeals*, 626 F.3d 178, 190 (4th Cir. 2010)).

The Title VII *McDonnell Douglas* burden-shifting framework applies to plaintiff's FMLA retaliation claim because FMLA retaliation claims are analogous to Title VII retaliation claims.

14

*See, e.g. Yashenko*, 446 F.3d at 550-51; *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001). Under that framework, plaintiff bears the burden at trial of making a prima facie showing "'that [s]he engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to the plaintiff's protected activity.'" *Yashenko*, 446 F.3d at 551 (quoting *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998)). If plaintiff "'puts forth sufficient evidence to establish a prima facie case of retaliation'" and the employer "'offers a non-discriminatory explanation'" for the adverse action, plaintiff "'bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation.'" *Id.* (quoting *Nichols*, 251 F.3d at 502). To meet her burden, the plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Ctr.*, 509 U.S. at 516-20, 113 S. Ct. 2742; *Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'" (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Defendant concedes that Ms. Westbrooks has established that she engaged in protected activity by using FMLA leave, and that Defendant took adverse action against her by terminating her employment. ECF 25-1 at 25. However, Defendant maintains that Ms. Westbrooks cannot establish a causal link between her FMLA leave usage and her termination. *Id.* A causal connection exists when "the employer takes adverse employment action against an employee

shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir.

2004), *abrogation on other grounds recognized by Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243,

299 (4th Cir. 2015).

Here, Ms. Westbrooks was terminated in March, two months after she exhausted her

FMLA leave. *See* ECF 28 at 4; ECF 28-12. Assuming that she has established a temporal

proximity between her FMLA leave usage and her termination, the burden shifts to Defendant to

offer a non-discriminatory reason for her termination. Ms. Westbrooks's March 16, 2018 Notice

of Dismissal and Charges for Removal reflects three charges: 1) violations of Articles 9, 10, and

15 of Policy 1.3.01 Standards of Conduct[6]; 2) a violation of Policy 1.3.28 Unexcused Absence[7];

and 3) a violation of Policy 1.3.13 Sick Leave Usage[8]. ECF 28-12 at 5-6. The first charge details

the March 14, 2018 interaction between Captain Greer and Ms. Westbrooks when she disobeyed

his order to return to his office and left the building. *Id.* The second charge details Ms.

Westbrooks's eight consecutive Code X markings from March 4, 2018 to March 15, 2018, along

with her previous history of Code X markings. *Id.* The third charge details Ms. Westbrooks's

failure to provide the necessary medical certification for her March 4, 2018 and March 5, 2018

absences, as required for employees on Exceptional Absenteeism Notice. *Id.* In addition, both

---

[6] Article 9 of Policy 1.3.01 provides: "Employees shall not be insubordinate or disrespectful to a supervisor." ECF 28-12 at 5. Article 10 provides: "Employees shall obey any lawful command or order, either verbal or written, given by any supervisor." *Id.* Article 15 provides: "Employees shall be strictly responsible for the proper performance of their duties." *Id.*

[7] Policy 1.3.28 provides: "Employees using unscheduled leave must use the leave in accordance with policy and procedures, failure to follow policies shall result in the employee being absent without permission [Code X]." ECF 25-2 (County Apx. 155).

[8] Policy 1.3.13 provides: "Employees are required to submit a medical certificate from their physician or health care provider with authorization to return to duty to the Shift Commander or their Unit Supervisor if: … The employee is on Exceptional Absenteeism Notice." ECF 25-2 (County Apx. 151).

BCDC Director Watts and Captain Greer testified that Ms. Westbrooks's continuous unscheduled absences, after she had exhausted her FMLA leave, contributed to her discharge. ECF 28-2 at 7 ("Q: And which of those reasons contributed to the termination of Ms. Westbrooks? A: 3/14 through 15."); ECF 28-18 at 8 ("Q: …the basis for the termination, if I'm understanding this correctly, was the absenteeism issue, the Code X markings, not the insubordination or alleged insubordination? A: No, the main reason why her employment was terminated was because of the unscheduled leave of the sick occurrences and the Code X marks.").

It is undisputed that Defendant's proffered reasons for terminating Ms. Westbrooks involve her history of excessive absences from work. Ms. Westbrooks argues that Defendant's "admission" regarding Ms. Westbrooks's FMLA usage in its Motion "clearly establishes that Plaintiff's FMLA leave contributed to the Plaintiff's termination." ECF 28 at 29. However, Ms. Westbrooks conflates her protected FMLA leave usage, which she knew was exhausted as of January 18, 2018, with the additional unscheduled sick leave she took, which violated Defendant's sick leave policies. On February 18, 2018, Ms. Westbrooks signed the Notice of Excessive Absenteeism Due to Illness, acknowledging February 16, 2018 "as her fifth occurrence of sick leave and [was] aware of the policy regarding future use of sick leave," and she "also acknowledge[ed] and was made aware of the Five Step and Corrective Action under the procedures of the Absence Control Policy." ECF 28-17. Consequently, pursuant to the Defendant's policy, Ms. Westbrooks would "be required to present medical documentation for every sick leave occurrence covering the entire period of absence due to sick leave taken, until further notice." *Id.*

Although she knew she was out of sick leave and FMLA leave, Ms. Westbrooks called out sick on March 4 and 5, 2018. *See* ECF 25-2 (County Apx. 007) ("Q: And then starting on 3/4, you're marked X, right? A: Yes. Q: That's because you were out of both sick leave and FMLA

leave, correct? A: Yes."). Her Absentee Report for March 5 reads, "Confirmed Westbrooks was advised that she doesn't have any sick time and will be marked Code X. Westbrooks advised she knows, will be under Dr.'s care." *Id.* (County Apx. 073). Ms. Westbrooks attempted to return to work on March 8, 2018, but was turned away because she did not have a doctor's note excusing her absences. *Id.* (County Apx. 028). On March 14, 2018, Ms. Westbrooks returned to work with a doctor's note from Orbach, excusing her absences from work from March 4, 2018 through March 11, 2018. ECF 28-1 ¶ 16. Director Watts accepted the doctor's note, but Ms. Westbrooks felt sick and needed to leave work again, for which Captain Greer told her she would be marked Code X. *Id.* ¶¶ 27-35. On March 15, 2018, Ms. Westbrooks called the BCDC to tell them she would be absent because of her anxiety, but on March 16, 2018, Ms. Westbrooks received an email from the BCDC telling her that she was not allowed to return to work. ECF 28-1 ¶ 37; *see also* ECF 25-2 (County Apx. 195-205).

The record reflects that Defendant had a legitimate, non-discriminatory reason for terminating Ms. Westbrooks, specifically that Ms. Westbrooks violated Defendant's leave policies. *See Blackwell v. Publix Super Markets, Inc.*, C.A. No. 6:16-2992-HMH-KFM, 2018 WL 953352, at *9 (D.S.C. Feb. 20, 2018) (affirming summary judgment for employer on retaliation claim because employer met burden to show that employee "was terminated because he failed to comply with [employer's] reporting requirements and failed to return to work upon the expiration of his FMLA leave"). Despite Ms. Westbrooks's subjective belief that she should have been covered by FMLA leave for her anxiety when her FMLA leave had been exhausted, that is not required by the law. ECF 25-2 (County Apx. 11) ("A: If I'm still sick due to my anxiety, it should be covered. Q: Even though you've already used the 480 hours? A: Yes, I believe it should be."). Under the FMLA, eligible employees are entitled to "a total of 12 workweeks of leave during any

12-month period." 29 U.S.C. § 2612(a)(1)(D). Again, Ms. Westbrooks acknowledged that her FMLA leave was exhausted on January 18, 2018, so she was no longer entitled to FMLA leave through the remainder of the 12-month period from May 12, 2017 to May 11, 2018, pursuant to the Department of Labor's June 1, 2017 Designation Notice. *See* ECF 28-1 ¶ 4; ECF 28-4. Moreover, Ms. Westbrooks acknowledged and signed the February 18, 2018 Excessive Absenteeism Notice that warned her of the consequences of future Code X markings. ECF 28-15.

Defendant has met its burden to provide non-discriminatory explanations for Ms. Westbrooks's termination, and the burden shifts to Ms. Westbrooks to show that Defendant's proffered explanations are pretext for FMLA retaliation. Ms. Westbrooks cannot meet her burden because she has not provided any evidence of pretext on Defendant's part. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) ("'[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action.'") (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989)). Accordingly, summary judgment is appropriate in favor of Defendant on Count Two.

### B. ADA and MFEPA Claims (Counts Four, Five, Six, and Seven)

Ms. Westbrooks alleges that Defendant failed to engage in an interactive process and to make reasonable accommodations for her disability under the Americans with Disabilities Act of 1990 ("ADA") and the Maryland Fair Employment Practices Act ("MFEPA"). "The [MFEPA] is the state law analogue to the federal discrimination statutes, and Maryland courts 'traditionally seek guidance from federal cases in interpreting [it].'" *Eubanks v. Mercy Medical Ctr., Inc.*, Civil No.: WDQ-15-513, 2015 WL 9255326, at *7 (D. Md. Dec. 17, 2015) (quoting *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 742 (Md. 2007)). Accordingly, the Court will analyze the MFEPA claims under the ADA standard.

The ADA prohibits discrimination against a "qualified individual with a disability" with respect to the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "One form of discrimination prohibited by the ADA is a failure to make a reasonable accommodation." *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 322 (4th Cir. 2011). In order to establish a prima facie case for failure to accommodate, plaintiff must show: "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 579 (4th Cir. 2015) (alterations in original) (quoting *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013). As a necessary corollary of the fourth requirement, the plaintiff must have communicated to her employer "a wish for accommodation of her disability." *Parkinson v. Anne Arundel Medical Ctr.*, 79 F. App'x 602, 604 (4th Cir. 2003).

The plaintiff bears the "burden of identifying an accommodation that would allow a qualified individual to perform the job," as well as "the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." *Lamb v. Qualex, Inc.*, 33 F. App'x 49, 59 (4th Cir. 2002). "Once the plaintiff has met his burden of proving that reasonable accommodations exist, the employer may present evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer." *Id.* Notably, "'[a]n employer is not obligated to provide an employee with the accommodation he or she requests or prefers; the employer need only provide some reasonable accommodation.'" *Crawford v. Union Carbide Corp.*, No. 98-2448, 1999 WL 1142346, *4 (4th Cir. Dec. 14, 1999) (citation omitted), *cert. denied*, 530 U.S. 1234, 120 S. Ct. 2669, 147 L.Ed.2d 281 (2000).

A reasonable accommodation is one that either "enable[s] [a qualified] individual with a disability … to perform the essential functions of [a] position," or "enable[s] [an] employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by … other similarly situated employees without disabilities." 29 C.F.R. §§ 1630.2(o)(1)(ii)-(iii). The applicable federal regulations provide, in part: "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). The so called "interactive process" should "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.*; *see also Haneke v. Mid-Atl. Capital Mgmt.*, 131 F. App'x 399, 399-400 (4th Cir. 2005) ("Implicit in the fourth element [of the prima facie case] is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation").

The responsibility to engage in the interactive process is "*shared* between the employee and the employer." *Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 736 (5th Cir. 1991). "A party that obstructs or delays the interactive process, or simply fails to communicate, is not acting in good faith to find a solution." *Fleetwood v. Harford Systems, Inc.*, 380 F. Supp. 2d 688, 701 (D. Md. 2005). Moreover, "the employer must work with the employee to determine what accommodation would help," and the employer "cannot escape liability simply because the employee does not suggest a particular reasonable accommodation that would assist him." *Id.* In the same vein, the employee "cannot prevail simply by demonstrating that his employer failed to engage in the interactive process; he must also show that this failure to engage in the process resulted in the failure to find an appropriate accommodation." *Id.*

Ms. Westbrooks's allegations in Count Five, that Defendant failed to engage in the interactive process when she "requested a change in her job of working in the POD to a walking post, to accommodate her anxiety disability," are refuted by the record. *See* ECF 18 ¶¶ 47-52. Ms. Westbrooks acknowledged that Defendant accommodated her need to be assigned to larger units because of her anxiety while at work. ECF 25-2 (County Apx. 32) ("Q: We've agreed that we accommodated your doctors' notes from June through March. And you've also agreed that you didn't request an accommodation using the county's processes to do that, right? A: Correct."). Accordingly, summary judgment is appropriate in favor of Defendant on Count Five.

The thrust of Ms. Westbrooks's accommodation claims is that Defendant failed to engage in an interactive process to reasonably accommodate her disability, and, as a result, failed to accommodate her requests to stay home from work when her anxiety flared up, after she had exhausted her FMLA, personal, and sick leave. ECF 28 at 14-25. Defendant acknowledges that Ms. Westbrooks's anxiety is a disability under the ADA, but contends that Ms. Westbrooks is responsible for any failure of the interactive process. ECF 29 at 6-10. In addition, Defendant maintains that granting Ms. Westbrooks's intermittent requests to stay home due to her anxiety was not a reasonable accommodation and would have imposed an undue hardship on Defendant. *Id.* at 10-15.

It is not clear, as a matter of law, whether the parties engaged in an interactive process to find a reasonable accommodation for Ms. Westbrooks's additional need for intermittent absences due to her anxiety. *See Moore v. Maryland Dep't of Pub. Safety & Corr. Servs.*, Civil No. CCB-11-553, 2011 WL 4101139, at *4 (D. Md. Sept. 12, 2011) (citing *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 783 (6th Cir. 1998) ("Whether [employee's] eight-month absence from her job to receive cancer treatment was a reasonable accommodation under the ADA,

or amounted to an 'indefinite leave of absence' that imposed an undue hardship on [employer], is a factual question that cannot be answered at this stage."). The record shows that Defendant was aware that Ms. Westbrooks was entitled to FMLA leave for her anxiety as of June 26, 2017, and that her anxiety caused "episodic flare-ups periodically preventing the employee from performing his/her job functions," requiring her to be absent from work during the flare-ups. ECF 28-3 at 5; ECF 28-4.

Both parties acknowledge Ms. Westbrooks's Code X markings, and that she was placed on Excessive Absenteeism Notice. While "[t]he Fourth Circuit has established some limits [] and has held that a request for indefinite medical leave without any assurance that the employee will be able to fulfill her position's essential functions upon return is unreasonable, as is a request for indefinite leave following a history of excessive absenteeism," a genuine issue of material fact remains as to whether Ms. Westbrooks was able to fulfill her essential functions upon her return. *See Barnett v. Uniformed Servs. University of the Health Sciences*, Civil Action No. DKC 10-2681, 2011 WL 3511049, at *11 (D. Md. Aug. 9, 2011) (citing *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995) (internal citation omitted)); *Moore*, 2011 WL 4101139 at *4; *see also Frazier v. Donahoe*, Case No.: PWG-14-3974, 2016 WL 1045853, at *7 (D. Md. Mar. 15, 2016) ("Where an employee is unable to perform the essential functions of his or her job, permitting that employee to use annual or sick while the situation is resolved is a reasonable accommodation.").

The record does reflect a history of excessive absenteeism, but it also reflects the Defendant's continued overall satisfaction with Ms. Westbrooks's work performance, despite her many absences. *See* ECF 25-2 (County Apx. 077-097) (Ms. Westbrooks's Employee Performance Evaluation Forms for 2013 through 2017). Specifically, Ms. Westbrooks's Employee Performance Evaluation Form for 2017, signed by Director Watts on January 23, 2018, gave Ms.

Westbrooks an overall rating of "successful," meaning Ms. Westbrooks "[c]onsistently demonstrated all of the competencies and accomplished the job purpose within the employee's span of control." *Id.* (County Apx. 097). Additionally, Ms. Westbrooks consistently brought in a doctor's note excusing her unscheduled absences, one of which was accepted by Director Watts on March 14, 2018, just two days before her termination on March 16, 2018. ECF 28-1 ¶ 27; ECF 25-2 (County Apx. 261) (Director Watts's affidavit stating, "[o]n March 14, 2018 Officer Westbrooks came to see me…because I was in a hurry, in order to quickly resolve and de-escalate this issue I told Westbrooks I would accept the note and that she should report to Capt. Greer for her assignment.").

Furthermore, Ms. Westbrooks testified that Lieutenant Merrill told her in January of 2018 that she would be accommodated for her anxiety, even when she ran out of FMLA leave. ECF 25-2 (County Apx. 009) ("A: …But I had spoke with Lieutenant Merrill prior to this in January, and I asked her what to do if I ran out of FMLA time and I had an anxiety condition. She said, [i]t doesn't matter. You will be accommodated for that anyway."); *see also* ECF 28-1 ¶ 11. Defendant's attorney responded, "[w]ell, we'll get to that," but this statement was never addressed in the remainder of the deposition transcript provided to the Court. ECF 25-2 (County Apx. 009). Importantly, Defendant does not refute Lieutenant Merrill's statement. If true, the statement serves to support Ms. Westbrooks's argument that her requests for intermittent leave due to anxiety, even when she had exhausted her entitled leave, could be accommodated. This statement, in addition to Defendant's past practices in allowing Ms. Westbrooks to collect Code X markings while maintaining a "successful" work performance, could undermine Defendant's argument that continuing to allow Ms. Westbrooks's intermittent leave would have constituted an undue hardship. Alternatively, a factfinder could determine that the sheer number of unscheduled

absences rendered Ms. Westbrooks unable to perform the essential duties of her position. Regardless, these questions are properly left for the jury.

In sum, Ms. Westbrooks has raised a genuine dispute as to whether Defendant failed to engage in the interactive process and, whether, as a result, Defendant failed to accommodate her requests for additional leave due to her anxiety. Accordingly, summary judgment is inappropriate on Counts Four, Six, and Seven.

### C. *Weingarten* Claim

In her Opposition, Ms. Westbrooks alleges that Captain Greer's continued questioning of her, after she requested union representation, violated her rights under *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 261 (1975). ECF 28 at 32. In her Amended Complaint, Ms. Westbrooks does not make any allegations about her rights under *Weingarten*, or that Defendant violated any National Labor Relations Board ("NLRB") regulations. *See* ECF 18. Ms. Westbrooks "is bound by the allegations contained in [her] complaint and cannot, through the use of motion briefs, amend the complaint." *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998). Accordingly, the Court will not consider Ms. Westbrooks's *Weingarten* claim.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment, ECF 25, will be GRANTED in part and DENIED in apart. A separate Order follows.


Dated: August 20, 2019                                    _____/s/_____
                                                          Stephanie A. Gallagher
                                                          United States Magistrate Judge